## McNeal *v.* State.

### [76 South. 625, Division A.]

1. HOMICIDE. *Manslaughter. Sufficiency of evidence.*
   Under the facts as set out in its opinion, the court held that the
   trial court should have set aside the verdict and granted de-
   fendant a new trial because the verdict was contrary to the
   overwhelming weight of the testimony.

2. HOMICIDE. *Self defense.*
   If a defendant's life was in real or apparent danger at the hands
   of deceased, and he believed it, then he had a right to shoot to
   kill.

3. HOMICIDES. *Justifiable homicide. Preventing felony.*
   If a defendant charged with homicide believed and had reasonable
   ground to apprehend, a design upon the part of deceased, to
   violate the chastity of the women in his house, and that there
   was imminent danger of this design being accomplished, then
   he had the right to shoot the deceased.

4. HOMICIDE. *Dying declarations. Statement of fact.*
   A dying declaration that defendant "shot me and didn't have any
   cause" is not inadmissible as merely an expression of an opin-
   ion but was the statement of a fact.

5. HOMICIDE. *Dying declarations. Competency.*

Where the state offers to introduce a dying declaration in evidence, the burden is upon the state to show that at the time the declaration was made, the deceased believed that he was going to die and had no hope whatever of recovery, it must be made under the realization and solemn sense of impending death.

6. SAME.

Where deceased says nothing about death, but prays the Lord, "who had helped him before," his declaration is not admissible.

7. SAME.

A statement, "I won't be with you much longer, I have got to leave you; O Lord, what a pity for Frank Neal to shoot a poor boy like I am for nothing. I never done anything to Frank"—was a mere exclamation of pity and was not admissible as a dying declaration.

8. HOMICIDE. *Manslaughter. Instructions. Defense.*

An instruction for the state defining manslaughter as killing "in the heat of passion without malice," at a time when defendant was in no danger at the hands of deceased but omitting "without authority of law" was erroneous, where defendant relied not only on self-defense but also on the defense of killing to prevent a felony, as such an instruction might lead the jury to understand it as a practical exclusion of the latter defense.

APPEAL from the circuit court of Winston county.

HON. H. H. RODGERS, Judge.

Frank McNeal was convicted of manslaughter and appeals.

Instructions Nos. 1 and 4, referred to in the opinion, are as follows:

"No. 1. The court instructs the jury for the state that they do not have to know the defendant is guilty before they can convict the defendant, but it is only necessary that the jury do believe from all the evidence in the cause beyond every reasonable doubt that the defendant is guilty, and if the jury do so believe from all the evidence in the case beyond every reasonable doubt that the defendant is guilty, then it is the sworn duty of the jury to find the defendant guilty as charged."

"No. 4. The court charges the jury for the state that in trying this case you should not hunt for doubts, with the view of finding any excuse or apology for your verdict, nor should you indulge in such doubts as are merely conjectural or chimerical, but the doubts which ought to make you pause and hesitate, must be reasonable doubts, and they must arise out of the evidence or the want of evidence in the case. You are not required by the laws of the state to know defendant is guilty of the crime charged against him before you can convict him, and you should not hesitate to find that he is guilty before you are able to say outside of the evidence that he might have been innocent, but, after considering all the evidence in the case, if you believe beyond every reasonable doubt that he is guilty, you should discharge your duty fearlessly under your oaths and under the law and say so by your verdict."

*Green & Green* and *Geo. Richardson,* for appellants.

The rule is settled in this state that to make dying declarations admissible, the party must believe in his immediate and impending dissolution. *Lembeth* v. *State,* 23 Miss. 354; *Fannie* v. *State,* 101 Miss. 380; *Bell* v. *State,* 72 Miss. 507, 17 So. 232; *Ashley* v. *State,* 37 So. (Miss.) 960; *Sparks* v. *State,* 74 So. (Miss.) 124, reiterates and approves the rule in *Bell* v. *State,* 72 Miss. 507, *supra.*

Proof of the competency of the dying declaration must be made to the court, as a predicate, beyond a reasonable doubt. *Fannie* v. *State,* 101 Miss. *supra; Bell* v. *State,* 72 Miss. 507, *supra; Guest* v. *State,* 96 Miss. 872.

In *Jones* v. *State,* 79 Miss. 309, it is held: "The admissibility of a dying declaration is to be determined by the court, and where the declaration is manifestly the statement of an opinion, although in form one of fact, it is inadmissible." *Dee House* v. *State,* 94 Miss. 123; *Owens* v. *State,* 59 Miss. 549; *Gould* v. *Crawford,* 2 Pa. St. 90; 1 Wigmore on Evidence, 632.

It is held in the *Lipscomb case,* 75 Miss. 559, that caution should be exercised by the court in admitting dying declarations, and as shown, *supra,* the proof of the competency must be made beyond a reasonable doubt.

Where the preliminary hearing establishing the predicate is in the absence of the jury, as here, it is error to admit evidence of the declaration without submitting to the jury the evidence upon which the admissibility was decided. 21 Cyc. 985-6.

The alleged declaration is condemned by *Norwood* v. *State,* 65 So. 851-2, where deceased said he was going to die, ''and that they had met him down there to kill him without a cause, and just had it made up with each other to do so,'' and this the court held (p. 852) was not admissible as the statement of a fact attending the killing. This case is clearly applicable to the case here. *Ford* v. *State,* 73 Miss. 734; *Shehan* v. *Kearney,* 82 Miss. 702; *Wood* v. *State,* 58 Miss. 742.

Instruction No. 5, for the state undertakes to instruct the jury as to manslaughter. It is fatally defective in its definition of manslaughter under the statute, in omitting, under sections 1236-38, Code 1906, the words ''without authority of law.'' *Ivy* v. *State,* 84 Miss. 264.

The court erred in modifying instruction No. 1 for the defendant. This instruction, as asked, asserted the right of McNeal to defend his home and the chastity of his family against the threatened action of Williams, and the court modified it by inserting, as a basis of this right that he ''used such force as was absolutely necessary to prevent him from carrying such threats into execution.'' The instruction, as asked, did not require that McNeal should be allowed to use only such as was ''absolutely necessary to prevent him from carrying such threats into execution,'' and we submit that the requirement that he should only use such force as was ''absolutely necessary'' was stating the rule too strongly against McNeal. *Staten* v. *State,* 30 Miss. 619.

We respectfully submit that on the facts of this case, appellant could not be convicted of any offense. We re-

spectfully submit that there was no foundation for the
verdict of manslaughter, and are at a loss to understand
how the court, under the circumstances, could have in-
flicted a penalty of eighteen years upon this unfortunate
appellant.

Wherefore the judgment should be reversed and a new
trial awarded, or that appellant be discharged.

*Frank Robinson,* for appellee.

While it is essential to the admissibility of dying dec-
larations, that they were made under a sense of impend-
ing dissolution and this must be satisfactorily established
to the judge before being admitted, yet it is not necessary
that the declarant should state that they were so made at
the time.   It is sufficient if it be satisfactorily shown in
any manner, that they were made under the sense of im-
pending dissolution, whether it be proven directly by the
language of the deceased, or be inferred from his evident
danger, or the opinions of the physicians or other attend-
ants, stated to the deceased, or from his conduct or other
circumstances of the case. *McDaniel* v. *State,* 8 S. & M.
401, 47 Am. Decisions 93; *Brown* v. *State,* 34 Miss. 433;
*Bell* v. *State,* 72 Miss. 507, 17 So. 232; *House* v. *State,*
94 Miss. 107.

It is argued by able counsel for the appellant when the
deceased was praying and stated that the Lord had
helped him once and he would help him again, that this
showed that he had hope of recovery.   I do not think that
this showed that this expression could be strained to
mean this, especially in view of the fact that there is not
a solitary line of other testimony to show that the deceas-
ed had, at any time, ever thought that he would recover.
In the case of *Dee House* v. *State,* 94 Miss. 107, one of the
leading cases in this state on dying declaraion, the declar-
ant stated, ''that he was going to die; that he believed he
was, and would like to see his wife before he died; that
'if I have to die, I want to die brave.'   He said that Dee
House had killed him and killed him without cause.''·

Counsel in that case, as in this, argued that the use of the words, "if I have to die" by deceased raised a reasonable doubt of his entire conviction of impending dissolution. So taking into consideraion, the condition of Bill Williams, the deceased, in the case at bar, as testified to by Winfred Thomason and Mrs. Williams and Dr. Sanders, I think a proper predicate was laid for the introduction of the dying declaration.

As was said in *Dee House* v. *State, supra*: "Taking into consideration all that deceased said and the condition under which his declaration was made, we think deceased was fully conscious that his end was at hand and that his declaration was made under the realization and solemn sense of impending death, and therefore hold that the proper predicate was laid." *Wiltcher* v. *State*, 54 So. 726.

It is illegal for the court to submit to the jury by charges questions of fact on which the admissibility of dying declaration depend. The point is further made that the dying declaration was not a statement of facts but a conclusion by the declarant, and that such a declaration is condemned by the case of *Norwood* v. *State*, 65 So. 851. This as an Alabama case. The test as to the admissibility was well stated by the court in the case of *Dee House* v. *State, supra*, on page 123, as follows: "To us the true and proper test as to admissibility is whether the statement is the direct result of observation through the declarant's senses, or comes from a course of reasoning from collateral facts. If the former, it is admissible; if the latter, it is inadmissible."

The statement that accused shot the deceased "without any cause whatever" is admissible. *Payne* v. *State*, 61 Miss. 161; *Powers* v. *State*, 74 Miss. 777, 21 So. 657. The assertion of the deceased that the accused killed him for nothing was properly received as a dying declaration. *Jackson* v. *State*, 94 Miss. 83, 47 So. 502. When everything, as shown by all the evidence, was fully known to the declarant his dying assertion that the accused "killed me and killed me without a cause;" may be accepted as the

statement of a fact and be received in evidence. *House* v. *State*, 94 Miss. 107, 48 So. 3, 21 L. R. A. (N. S.) 840, note.

The fifth instruction for the state in as follows: "The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that the defendant killed the deceased in the heat of passion, without malice, at a time when he was in no danger, real or apparent, of losing his life or of receiving great bodily harm at the hands of the deceased, you will find him guilty of manslaughter, and the form of your verdict will be: 'We, the jury, find the defendant guilty of manslaughter.'"

Complaint is made of this instruction because it omits the words, "without authority of law" found in the statutory definition of manslaughter. Sections 1236-1238, of the Code of 1906. This case was reversed because of the improper omission of certain testimony, though the court did state that the instruction for the state ought to have contained the words "without authority of law." It does not by any means follow that the court would have reversed the case if the only proposition before it had been the defective instruction.

The defense in this case was self-defense. The question as to whether the killing was with or without authority of law does not enter into the determination of the issues. It does not follow that the omission of such phrases in an instruction is necessarily reversible error. *Guest* v. *State*, 96 Miss. 871, 52 So. 211.

It has always seemed to me that the phrase, "without authority of law" would be surplusage in all definitions of manslaughter unless it might be that some officer were on trial for the killing of some person wherein the issue as to whether the killing was with or without authority of law might be involved.

Counsel for appellant argue somewhat at length that this case should be reversed on the facts. It might be that from a reading of the printed record, a judge could say that if he had been a member of the jury that tried the appellant, he would have reached a different conclusion. The appellant made out a very strong defense and I am

unable to see just why the jury took the testimony of the
state as true rather than that of the appellant's witnesses.
It may have been due to the attitude and bearing of the
witness on the stand, which is not possible for this court
to see.   However, this is not one of those cases where
the testimony of the state is not sufficient to sustain the
verdict of the jury if it is to be taken as true.  I have no
hesitancy in saying that so far as the facts are concerned,
I do not think the record would warrant a reversal.

In conclusion, I submit that the dying declaration was
properly admitted and that the instructions for the state
were not erroneous, and that the facts as shown by the
state are sufficient to warrant the verdict of the jury, and
therefore I think the case should be affirmed.

Sykes, J., delivered the opinion of the court.

The appellant, Frank McNeal, was indicted for the mur-
der of one Will Williams, and convicted of manslaughter,
in the circuit court of Winston county. He was sentenced
to serve a term of eighteen years in the penitentiary,
from which sentence and judgment this appeal is prose-
cuted.   There are a great many errors assigned as cause
for reversal, but our view of the case only renders it
necessary for us to notice those below mentioned.

One of the grounds assigned for a new trial in the mo-
tion therefor, and assigned here as error, is that the ver-
dict of the jury was contrary to the law and the evidence.
In considering this ground it is necessary for us to review,
somewhat in detail, the material testimony in the case.

The undisputed testimony is that Bob Albritton had hid-
den a quart bottle containing about a pint and a half of al-
cohol in a field, and on the Sunday morning of the tragedy
Albritton borrowed from the appellant a mule and then
got the deceased, Will Williams, to accompany him in a
search for this bottle.   When they found it Albritton and
Williams took several drinks, and then went to the house
of McNeal to return the mule.   Williams rode the mule,
and Albritton walked with him.  On arrival at McNeal's

house, Albritton took a seat upon the gallery, where there were several women, among them Mrs. McNeal, wife of appellant, Mrs. Albritton, wife of Bob Albritton, and her daughter, and Mrs. Johnson, a sister of McNeal. McNeal and Williams went to the lot together to put up the mule. The women having noticed that both Williams and Albritton were drinking heavily, if not then drunk, one of them, Mrs. Johnson, asked Albritton at that time to get Williams away from the house, as they were afraid of him. On the arrival of Williams and Albritton at the house, McNeal was there with the women, making preparation to take his sister, Mrs. Johnson, to her home. Albritton persuaded Williams to leave at that time, and these two proceeded to Albritton's house, which was about two hundred yards from that of McNeal. Shortly thereafter, Albritton and Williams returned to McNeal's house. They both seemed to be more under the influence of drink than on the first visit. The testimony shows Williams was staggering at the time.

The uncontradicted testimony here shows that Williams, over the protest of the women, and especially of Mrs. McNeal, entered the house, and in doing so pushed Mrs. McNeal forcibly away from the door of the room in which was McNeal. The testimony is somewhat contradictory as to whether or not Williams cursed and abused the women and McNeal while he was in the room. The witnesses who were in the room at the time he was there testified that he was cursing and generally boisterous in the room. The other witnesses testify that they did not hear him cursing while in the room. Mrs. Johnson went out to where Albritton was, and asked him a second time to see if he could not get Williams away from the house. Albritton and his wife and a Mr. Sullivan got Williams and persuaded him to leave the house. Mrs. Albritton proceeded down the road some distance with him, and testified that Williams told her he would not return to McNeal's house if she would go on away. She then left Williams and the men who were with him and returned to the house. Mr. Sullivan also soon left Albritton and Williams

and returned to the house. Williams and Albritton then went to an old house about a quarter of a mile away from the McNeal house. The view between these two houses is obstructed. While Williams was in the room with Mc-Neal, the uncontradicted testimony shows that McNeal was shaving, and that he tried to persuade Williams to leave and not disturb the women.

The testimony is somewhat conflicting as to when the defendant, McNeal, first got his pistol. The testimony of some of the women is that when they saw Albritton and Williams returning to the house a second time, upon the suggestion of some of them Mrs. McNeal hid the pistol, as they felt there might be some trouble at that time, and then later on she gave the pistol to McNeal. McNeal's testimony is that at that time he put the pistol in his pocket to prevent Williams from getting it in case he became violent. The three women witnesses, Mrs. Albritton, Miss Albritton, and Mrs. Johnson, testified that shortly after Williams and Albritton had entered this old house they heard Williams cursing very loudly, and stating that he was going back to McNeal's house and violate the chastity of all of the women there. This fact is contradicted to a certain extent by the testimony of Bob Albritton, one of the state's witnesses. Albritton was with Williams at this time. He states that Williams cursed and abused him, but at no time did he hear him threaten to return to McNeal's house, as testified to by the above witnesses in the case. The testimony of this witness, however, in our opinion, is not entitled to very much credence. An affidavit had been made against him for the murder of this same man. All the testimony in the case shows that he was drinking very heavily, if not completely drunk, during all of the disturbance. His testimony is negative all the way through. Facts that he should have known had he been sober he showed an uncertainty about in all his testimony.

The testimony of the defendant, McNeal, corroborated by all of the three women witnesses in the case, one of whom (Mrs. Albritton) testified for the state, is to the effect that when the women heard these threats of Wil-

liams to return to the house, they requested McNeal to go
down and see if he could not get Williams to go away. In
pursuance of this request, McNeal went to where Williams
was. · His testimony is that he met Williams and Albrit-
ton returning to the house a short distance from the old
house where they had been. The testimony of Albritton
is that McNeal came to the old house where they were.
McNeal's testimony is that after meeting them he per-
suaded Williams to return to the old house. While they
were in this house, the uncontradicted testimony shows
that Williams and Albritton engaged in a fuss, and Wil-
liams threw some of the alcohol in Albritton's face, and
Albritton finally left. Shortly after this Williams and
McNeal left the house, and Albritton joined them on the
road in a few minutes, and he and Williams engaged in a
fight in which Williams knocked Albritton down and kick-
ed him, and Albritton then retreated rather hurriedly to
the home of McNeal.

When McNeal and Williams came into view of the wo-
men at the McNeal house, all of their testimony and that
of Sullivan's, which corroborates that of the defendant, is
that Williams, with his left hand, had hold of McNeal's
right arm; that Williams was cursing, saying that he was
going to McNeal's house and carry out his threat against
the chastity of the women there; that when they reached
a distance of about fifty or sixty yards from the house,
McNeal hollered to the women to run and get away from
the house. When he did this some of the witnesses tes-
tify that they saw Williams, with his right hand, choke
McNeal. Others did not see the choking, but all testify
that Williams reiterated his intention of going to the
house for the heinous purpose above stated, and then,
while throwing his right hand to the hip pocket, cursed
McNeal and told him that he would shoot him. At this
time they testify that McNeal, with his left hand, drew
his pistol from his right hip pocket, and shot Williams.
The shot entered the right breast. Williams then drop-
ped McNeal's arm and McNeal retreated by backing
away from Williams. Williams advanced several steps

and then turned and walked away, and McNeal returned to his home. Only one shot was fired.

The testimony above enumerated is not contradicted by a single eyewitness to the difficulty. The witness Albritton at that time was sitting on the gallery of McNeal's home. He contradicts this testimony to this extent only: He says that he did not hear Williams cursing and threatening the women. All three of the women witnesses and Sullivan, as well as the defendant, testified, however, to these facts.

Williams was subsequently carried home by the doctor with the assistance of several other men. The bed clothing upon which he was carried was lent by the defendant.

The testimony all shows that there was no ill feeling against Williams by McNeal; that McNeal was sober at the time; that when the women requested him to go down and try to get Williams away, he stated that he would do so; that he thought he could persuade him to go home and go to bed. Nowhere is it shown that he acted as a man in the heat of passion, or with ill feeling toward the defendant up until the time of the shooting. The defendant himself testified that he only shot Williams after Williams had stated that he was going to kill him, and he thought he was attempting to carry out this intention by throwing his right hand to his hip pocket. Both the men were in their overalls, and neither had on coats. The defendant testified that he did not know whether Williams had a pistol in his pocket or not, that he did not look to see, but that from his action and conduct he assumed that he had and that he shot to protect, as he thought, his own life. The defendant testified that just before the shooting, and while Williams had him by the right arm, he was doing what he could to persuade Williams to go home and not try to go to his house.

A witness was introduced for the state, who testified that a day or two after the killing he had a conversation with the defendant, in which the defendant told him that before Williams threatened to shoot him he, the defendant, already had his pistol in his left hand. This witness

115 Miss.—44

further testified that the defendant told him he did not
shoot until he was satisfied Williams intended to shoot
him. He was also told by the defendant about the threats
Williams was making to violate the chastity of the women
just preceding the homicide. The only contradiction in
this testimony and that of the defendant was that he stat-
ed he understood the defendant to say he had his pistol in
his hand before Williams threatened to kill him.

It was shown that McNeal and the deceased were only
slightly acquainted; that there was no ill feeling between
them; that the deceased was a large and powerful man,
and was very violent when drinking; that he was phys-
ically a more powerful man than the defendant. The tes-
timony further showed that the defendant's shirt and
shirt sleeve were badly torn and his right arm bruised by
the deceased.

At the time of the shooting it is to be remembered that
the three women eyewitnesses and Mr. Sullivan, as well
as the defendant, testified to the fact that the deceased,
Williams, had hold of the defendant's right arm with his
left hand, and at that time stated his intention of going
to the defendant's house to violate the chastity of the
women, and also stated that he would blow the defend-
ant's brains out, and coupled these declarations with a
movement of his right hand to his hip pocket. Only a
part of this testimony is contradicted by any witnesses,
and that part is the negative testimony of the witness Al-
britton, who, the testimony shows, was drunk, and that
testimony of his was that he did not hear these threats of
the deceased.

On this testimony as to the immediate homicide, we un-
hesitatingly say that the court should have set aside the
verdict and granted the defendant a new trial because
the verdict was contrary to the overwhelming weight of
the testimony. If the defendant's life was in real or ap-
parent danger at the hands of the deceased, and he be-
lieved it, then he had a right to shoot to kill. If the de-
fendant believed, and had reasonable ground to appre-
hend, a design upon the part of the deceased, Williams,

to violate the chastity of the women in his house, and that there was imminent danger of this design being accomplished, then he had the right to shoot the deceased.

The next error committed by the trial court was in failing to exclude from the consideration of the jury the alleged dying declaration of the deceased made Monday morning to the witness Thomason. In the preliminary examination as to the competency of this testimony before the court, the facts were not as fully developed as they were before the jury, viz. as to the exact time when the declaration was made, and the time when the deceased expressed the belief that he was going to die. In the testimony before the jury, however, this fact was fully developed. The alleged dying declaration was in these words:

"He said the boys—he never called any name—come up there and persuaded him off, and Frank shot him and didn't have any cause, and that he didn't do anything to him, and said now they got him."

There are two objections urged to the admissibility of this declaration: The first is that it was not made while the deceased was under the realization and solemn sense of impending death. The second is that it was not a declaration of the facts of the homicide, but merely the expression of the opinion of the declarant. As to the second question, we will say that the decisions in this state have gone as far as—and probably further than—those of the majority of the other states in construing declarations as facts. Statements that accused had shot the deceased "without any cause whatever" were held admissible in the cases of *Payne* v. *State,* 61 Miss. 161; *Powers* v. *State,* 74 Miss. 777, 21 So. 657. A statement that the accused had "killed him for nothing" was admittted in the case of *Jackson* v. *State,* 94 Miss. 83, 47 So. 502. Also, the statement that the accused "killed me and killed me without cause" was admitted in *House* v. *State,* 94 Miss. 107, 48 So. 3, 21 L. R. A. (N. S.) 840. While we think that these decisions carry the doctrine to its furthest extent, and we are not disposed to overrule these cases, we shall certainly extend the doctrine no further.

On the other question, however, we think that the declaration was not admissible. The burden is upon the state to show that at the time the declaration was made the deceased believed that he was going to die and had no hope whatever of recovery. It must be made, as all our authorities hold, "under the realization and solemn sense of impending death." *Fannie* v. *State,* 101 Miss. 380, 58 So. 2; *Bell* v. *State,* 72 Miss. 507, 17 So. 232, and numerous other authorities.

The testimony of the witness Thomason shows that Sunday night, during conscious intervals which Williams had, he prayed to the Lord to help him, and said that the Lord had helped him once before when he prayed to him. Up until the time of this declaration, Williams had not expressed to this witness, or to any other witness so far as the record discloses, the thought that he expected to die. About an hour and a half after the declaration was made, this same witness testifies that it was then that the deceased told him for the first time that he was going to die. Before this declaration could have been admissible, it was incumbent on the state to have proven that at the time it was made the deceased must have believed in his immediate and impending dissolution. *Lambeth* v. *State,* 23 Miss. 354; *Bell* v.*State, supra; Fannie* v. *State, supra; Sparks* v. *State,* 133 Miss. 266, 74 So. 124. Proof of the competency of a dying declaration must be made to the court beyond a reasonable doubt before it is admissible is also held in the above authorities.

The witness Thomason testified that Mrs. Williams was in the room when the above declaration was made to him, but that he was not present during all the conversations between the deceased and his wife.

The court also admitted in evidence, over the objection of defendant, an alleged dying declaration made to Mrs. Williams, the wife of deceased, some time on Monday in the following words:

"I won't be with you much longer; I have got to leave you. O Lord, what a pity for Frank McNeal to shoot

a poor boy like I am for nothing.  I never done anything to Frank.''

This alleged dying declaration is different from one testified to by the witness Thomason, as shown on its face. From this declaration it appears that the deceased believed he was going to die.  It is inadmissible, however, because it does not purport to state the facts of the homicide, but is at most a mere exclamation of self-pity of the wounded man. It was error to admit either of the above alleged dying declarations.

Instructions Nos. 1 and 4, given the state, are assigned as error.  The objection urged to instruction No. 1, however, is cured by the other instructions in the case.  Instruction No. 4 has been repeatedly condemned by this court as being erroneous, but the court has uniformly declined to reverse a case merely for the giving of this instruction.

The giving of instruction No. 5 for the state was very serious error.  It is as follows:

''The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that the defendant killed the deceased in the heat of passion, without malice, at a time when he was in no danger, real or apparent, of losing his life, or of receiving great bodily harm at the hands of the deceased, you will find him guilty of manslaughter, and the form of your verdict will be: 'We, the jury, find the defendant guilty of manslaughter.'''

It omitted, however, therefrom the words "without authority of law." It is contended in the able brief of the assistant attorney general, Mr. Roberson, that the omission of these words from the charge could not have prejudiced the defendant's case before the jury because his defense was self-defense.  It is true that he testified that he shot the deceased in order to protect his own life. He was, however, entitled to the further defense that he had the right to kill the deceased to prevent him from committing a felony upon the women as we have before specifically stated; and the omission of the words "with-

out authority of law'' from this charge may have been understood by the jury as a practical exclusion of this defense. Section 1230, Code of 1906, under subsection ''f,'' states that it is justifiable to kill a human being ''when committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.'' *Staten* v. *State,* 30 Miss. 619.

In conclusion, it is our opinion that the lower court erred in admitting for the consideration of the jury the two alleged dying declarations of the deceased, in the giving of the fifth instruction to the state, and in not setting aside the verdict and granting the defendant a new trial because the verdict of the jury was contrary to the overwhelming weight of the testimony.

*Reversed and remanded.*