CRAWFORD v. STATE.*

(Division B.   Dec. 6, 1926.)

[110 So. 517.   No. 25915.]

1. HOMICIDE. *Statement, made after abandoning all hope of recovery, while sane and rational, is admissible as "dying declaration."*

Where the evidence, in a prosecution for murder, shows that the deceased had abandoned all hope of recovery, and death was imminent, and such person, after such facts appear, makes a statement as to how the transaction occurred, such is admissible as the dying declaration; the proof showing that the declarant was sane and rational at the time of making such statement.

2. CRIMINAL LAW. *Instructions, if defendant was guilty, to render one of three verdicts, and defining manslaughter, and that, if defendant so killed deceased he could be convicted of manslaughter, were not erroneous, when read together.*

Where the state, in its instruction on the form of verdict in a prosecution for murder, tells the jury that, if it finds the defendant guilty as charged, it may render one of three verdicts usually contained in such instructions, and the penalty that will follow a verdict under said hypotheses, and also defines manslaughter in a separate instruction, and tells the jury that, if they believe the defendant so killed the deceased, they may find him guilty of manslaughter, there is no reversible error, as all the instructions are to be read together and construed as a whole.

3. CRIMINAL LAW. *Homicide. Refusal of instructions as to right to defend habitation was not error, in absence of testimony of attack on dwelling; instruction must be predicated on evidence.*

In a prosecution for murder, where the defendant testifies that he shot the deceased in self-defense, and the deceased was drawing a weapon at the time, and does not testify to any facts showing that the killing was done to prevent a felony upon or in his dwelling, the defendant cannot complain at the refusal of instructions submitting to the jury the right to defend one's habitation. The instruction must be predicated upon the evidence.

4. CRIMINAL LAW. *Where ample instructions present defense disclosed by evidence, refusal of other instructions requested is not reversible error.*

Where the defendant procures ample instructions to present his defense disclosed by the evidence to the jury, it is not reversible error to refuse other instructions requested by him.

*Corpus Juris-Cyc. References: Criminal Law, 16 C. J., p. 1045, n. 39; p. 1049, n. 82; p. 1050, n. 84; p. 1063, n. 85; Homicide, 30 C. J., p. 255, n. 24; p. 264, n. 42; p. 392, n. 83.

APPEAL from circuit court of Leflore county.

HON. S. F. DAVIS, Judge.

Frank Crawford was convicted of manslaughter, and he appeals. Affirmed.

_Boothe & Pepper,_ for appellant.

I. _Dying declaration._ This court has always been very guarded and extremely careful in the admission in a criminal case of statements made by the deceased to be used as evidence against the defendant, unless the so-called dying declaration meets every requirement of the law as construed in a long line of authorities touching every phase of such statement and declarations. In this case the declarant at best and in his strongest statement in behalf of the state merely expressed an opinion that he would never get well. "Declaration made by declarant who merely stated that he would never get well is not sufficient and is inadmissible in evidence." _Snell_ v. _State,_ 109 Miss. 744, 69 So. 593. What is a dying declaration? See _Lewis_ v. _State,_ 9 S. & M. 115; 1 Mor. St. Cas. 392; _Joslin_ v. _State,_ 75 Miss. 838, 23 So. 515.

Statements made by deceased to a physician, when deceased was not told that he was going to die, even though the statements were made about the star of the evening preceding the night of the deceased's death, are not admissible. _Sparks_ v. _State,_ 6 So. 843.

Dying declaration must be made under the realization and solemn sense of impending death, when the motive for falsehood may be presumed to be lost in the despair of life. _Lipscomb_ v. _State,_ 75 Miss. 559, 23 So. 230; _Jos-_

*lin* v. *State,* 75 Miss. 838, 23 So. 515.; *Brown* v. *State,* 78 Miss. 837, 29 So. 519, 84 A. S. R. 641; *Guest* v. *State,* 96 Miss. 871, 52 So. 211.

Where a dying declaration is manifestly a statement of an opinion, although in form one of fact, it is inadmissible. *Jones* v. *State,* 79 Miss. 309, 30 So. 759. The truth and proper test as to admissibility of a dying declaration is whether the statement is a direct result of observation through declarant's senses or comes from the course of reasoning from collateral facts. If the former, it is admissible; if the latter, it is inadmissible. *House* v. *State,* 94 Miss. 107, 48 So. 3, 21 L. R. A. (N. S.) 840. N.

To render a statement admissible as dying declaration, there must be clear proof that at the time there was on the part of the deceased a settled belief of impending death and the absence of all hope, however slight, of recovery. It is not necessary that he should have stated such belief, nor on the other hand, is his mere statement thereof conclusive as to the suggestion. *Bell* v. *State,* 72 Miss. 507, 17 So. 232.

In passing on the competency of a dying declaration the court should make full inquiry as to the circumstances and, if necessary, require all witnesses capable of throwing light on the subject to be produced and it should be excluded if there be a reasonable doubt as to its competency. *Bell* v. *State,* 72 Miss. 507, 17 So. 232.

In the absence of specific proof that the alleged dying declaration is made by declarant when resting under an abiding sense of impending dissolution, such declaration is inadmissible in evidence. See also *Ashley* v. *State,* 37 So. 960.

Competency of dying declaration is a preliminary question for the court. They should be admitted only when full investigation of circumstances under which they were made shows them to be competent. *Owens* v. *State,* 59 Miss. 547; *Lipscomb* v. *State,* 75 Miss. 559, 23 So. 230.

As a preliminary question the admissibility of a dying declaration is determined by the court and the degree of proof required to establish that the declarant realized he was *in extremis* is such as to exclude all reasonable doubt. *Lipscomb* v. *State,* 75 Miss. 559, 23 So. 230; *Guest* v. *State,* 96 Miss. 871, 52 So. 211.

It is very interesting to note how carefully guarded are the rights of a defendant, when dying declarations are offered in evidence against him, by this court, See *Hill* v. *State,* 64 Miss. 431, 1 So. 494; *Gambrell* v. *State,* 92 Miss. 728, 46 So 138, 17 L. R. A. (N. S.) 291; *Lambert* v. *State,* 23 Miss. 222; *Merrill* v. *State,* 58 Miss. 68; *Reeves* v. *State,* 109 Miss. 885.

II. *Sense of impending death must be realized. Wilkerson* v. *State,* 98 So. 77 —; *McNeil* v. *State,* 76 So. 625; *Hawthorne* v. *State,* 102 So. 772, *Lea* v. *State,* 103 So. 368.

III. *Defense of Habitation and property.* A man's habitation is his castle, and he can defend it against all intruders. The authorities from all states are unanimous on this principle of law. *State* v. *Raper,* 42 S. W. 935, 141 Mo. 327; *Crawford* v. *State,* 112 Ala. 1; *Smith* v. *State,* 106 Ga. 673, 71 A. S. R. 286; *Hayner* v. *People,* 72 N. E. 792, 213 Ill. 142; *Thompson* v. *State,* 85 N. W. 62, 87 A. S. R. (Neb.), 453; *McGlothlin* v *State,* 53 S. W. (Tex.), 869; *Boykin* v. *State,* 86 Miss. 489, 38 So. 725; *Patterson* v. *State,* 95 S. W. (Tex.), 129; *Ayers* v. *State,* 60 Miss. 709. The above decisions from our court are fortified by section 960, Hemingway's Code (section 1230, Code of 1906), Justifiable Homicide.

*J. A. Lauderdale,* Assistant Attorney-General for the state.

I. *The dying declaration.* The leading and ruling Mississippi case regarding the admissibility of dying

declarations is *Lipscomb* v. *State,* 75 Miss. 559, at 579. We submit that under the ruling laid down in that case the dying declaration introduced in this case was entirely competent and admissible.

II.  Instructions 1, 3, and 4 are definitions of murder and the various verdicts the jury might find in the event they found the defendant guilty of murder.  These instructions are all correct propositions of law, applicable to the facts in this case, and were correctly given.

Instruction No. 2 for the state defines manslaughter and requires the jury to find the defendant guilty of manslaughter.  Counsel for appellant contends that under the proof in this case there was no element of manslaughter and the instruction should not have been given. This court has repeatedly held otherwise, and very recently in *White* v. *State,* 107 So. 755.  Instruction No. 7 for the state was approved in *Tatum* v. *State,* 107 So. 418.

III.  *Motion for a new trial.*  Defendant filed a motion for a new trial.  This motion alleged that the jurors who tried this case were allowed to separate during the trial.  Testimony was taken on the motion which showed that the jury room was adjoining the court room; that the jury was in the box; that one of the jurors left the jury with the bailiff and went into the jury room and into the lavatory; that neither of the doors were closed; that the juror was in the presence of the bailiff at all times and he was away from the other eleven jurors for only a few minutes.  The proof showed conclusively that no communications were had with this juror and that nothing was done that could in any way influence his verdict.  *White* v. *State,* 107 So. 755; *Ned* v. *State,* 33 Miss. 364.

Argued orally by *A. M. Pepper,* for appellant, and *J. A. Lauderdale,* Assistant Attorney-General, for the state.

ETHRIDGE, J., delivered the opinion of the court.

The appellant was indicted for the murder of one E. M. Page in the circuit court of Leflore county, convicted of manslaughter, and sentenced to serve a term of five years in the penitentiary.

Crawford was a tenant on the place of E. M. Page during the years 1924-25, and had remained thereon after the expiration of the year 1925 for the purpose of gathering a portion of his crop. He was working a crop on shares, and Page desired the premises, and had made demand therefor. On the morning of the shooting, E. M. Page, in company with his brother, went to the place occupied by Crawford for the purpose of seeing about obtaining possession of the house. There is a dispute as to what occurred on this visit, but E. M. Page was shot at said place on said morning.

After Page was shot, he was hurried to Greenwood and attended by physicians; but he died the following night about eight o'clock. There was no chance of his recovery. When the physician first arrived to examine his wounds, Page stated to him that he would never recover, and the physician tried to encourage him to believe that it was not so bad, but apparently without success. However, that night, Page's condition was not hopeful, and he so informed him. The county attorney and Dr. Smith, a dentist, visited the deceased for the purpose of getting a dying declaration. The testimony of the attending physician is in part as follows:

"Q. What did he say? A. The first thing he said, when I walked into the room, was: 'Well, Doctor, they have got me this time. This is going to kill me.'

"Q. What did you say in reply? A. I said 'Oh, I don't think so.' I remember I made the remark, 'Possibly it is not so bad.'

"Q. Did you examine him at his residence? A. Yes, sir; I did.

"Q. As a result of that examination, what determination was made as to whether he was to remain there or be carried somewhere else? A. On account of the se-

riousness of the wound, we decided it was best to bring
him to the King's Daughters' Hospital for treatment.

On cross-examination he was asked as follows:

"Q.  Didn't he further tell you that he had had many
a close call and many difficulties, but that he believed
they had got him this time.  Didn't he tell you that?
A.  He told me words to that effect; yes sir.  He didn't
say he believed.  He said, 'They have got me this time.'

"Q.  Now, Doctor, at the hospital, while he was there,
you continued, as the good physician, working the men-
tal effect, the psychology of it, as it were, and tried all
the while to cheer Mr. Page up?  A.  As much as pos-
sible.

"Q.  You were trying all the while to impress upon
him that he would respond to the treatment and recover?
A.  Yes, sir.

"Q.  You had that hope, and you never told him that
he was *in extremis* until after this statement was made?"

Dr. F. H. Smith, for the state, testified as follows:

"Q.  Did he say anything to you as to his condition?
A.  Yes, sir.

"Q.  What did he say?  A.  'They have got me this
time. I am gone.'

"Q.  Did you talk to him any more?  Did you hear him
say anything else at his home?  A.  No, sir.  .  .  .

"Q.  What did he say with reference to his condition
(after being brought to the hospital)?  .  .  .  .  A.  He
told me that he had had many close calls, and never felt
before that he was going to die; but he felt satisfied
this time he would never pull through.  .  .  .

"Q.  When you went into the room, what happened
after you got in there?  A.  When we went in he seemed
to be asleep, but woke up and recognized Means John-
son, and Means spoke to him, and he said: 'Means, I
am glad to see you.  They have got me this time, old
boy; there is no chance for me.'

"Q.  Did you ask him anything?  A.  Dr. Gillespie
told him he was in a pretty serious condition, and asked

him if he realized his condition, and I said, 'Elbert, who shot you?' and he said, 'I haven't seen him until yet.' I said, 'Have you had any hard feelings with Mr. Crawford?' And he said, 'Not a bit in the world.' I asked him if he and Mr. Crawford had had any harsh words, and he said, 'Not a thing in the world,' and said he was standing out in front of the porch, and Mr. Crawford was on the porch, and that he was talking to Mrs. Crawford about vacating the house, and didn't know who seen him, and didn't know who shot him until yet.''

The defendant's counsel, on cross-examination, asked Dr. Smith the following question:

''Q. You were asked a few minutes ago, and you stated, that he told you he had had many close calls before, and you had helped him and seen him through. He was referring to the time when he killed a man in Yalobusha county was he not?''

This question was objected to, the objection sustained, and exception taken. He was then asked:

''Q. You lived in Yalobusha county with him? A. Yes, sir.

''Q. As a matter of fact, you have been sheriff of Yalobusha county? A. Yes, sir.

''Q. You knew Mr. Page at that time, and have known him since? A. Yes, sir.''

Counsel for the state asked the following question:

''Q. What was he referring to when he said you had been with him on many close calls, and had helped pull him through, but you could not pull him through this? A. I was with him when he had one of is kidneys removed and came very near bleeding to death.'' .

Counsel for defendant asked:

''Q. He did not tell you that he referred to one of his kidneys being removed, and so far as you know may have been referring to the time he killed a man over in Yalobusha county?

MR. McBEE (for state): We object to that, and ask the jury to disregard that question in making up their

verdict; ask that you so instruct the jury. (Sustained, and jury so instructed. Exceptions by defendant.)"

The brother of the deceased testified that appellant shot his brother with a shotgun, and that it occurred about eleven o'clock; that his brother had had a stroke of paralysis, and was just getting up therefrom when this happened, February 23, 1926; that this happened at Crawford's house, and that Crawford had been living upon his brother's place for two years, and lived about a quarter of a mile from Page's residence; that Page, on the occasion he was shot, was standing in front of Crawford's house, which was a three-room house facing south; that Page was not angry; his purpose in going there was to get Crawford to remove from the house; that when they drove up the deceased went into the yard, and Mrs. Crawford was sitting on the shelf on the west end of the house; that Page's eyesight was bad, and he could not see far off; that he walked into the yard to within five steps from the porch, and Mrs. Crawford said "Good morning" to him, and he said, "Good morning, Mrs. Crawford;" and then said, "Mrs. Crawford, is Frank here?" and she said, "No, sir;" and Page said, "Well, Mrs. Crawford, do you know when Frank—when you all—are going to move?" and she said, "No, sir; I don't know exactly; we have been figuring on moving two or three days;" and Page said, "Yes; Frank promised me Friday he would move Saturday;" that this was Tuesday, and Page said, "He hasn't moved yet; you know, Mrs. Crawford, it is getting time everybody was at the place they are going to stay this year; I need my house, and I need it awful bad, and I wish you all would move;" and Mrs. Crawford said, "Mr. Page, I know it is time everybody was where they are going to stay;" but "it looks like we are going to have trouble; something was going to come up;" and he said, "We did not have any trouble when you came, and won't have any when you leave; just as soon as you can let me have my house," and that he then turned around and started back to the

144 Miss.—51.

car, and she said, "It looks like trouble;" and that about that time Crawford shot him; that Crawford was in the room when he shot; that Page had not said anything to Frank Crawford; that, when he shot him, Page did not know who shot him; and that he turned to the witness, and said, "Jesse, who shot me?" and the witness said, "Frank Crawford;" that deceased started to the car, and, seeing he could not make it, witness hopped out of the car, and took his brother in the automobile, and brought him home.

Frank Crawford testified that he finished picking his cotton on the 5th day of February, and hauled the last to the gin the 16th of February; that he made fourteen bales of cotton; that there were four members of his family; two boys and a girl, and his wife; that the first thing that attracted his attention on the morning in question was that he heard a fuss in the yard; that he was lying on the bed sick; that he had had a fight with Jesse Page, and had been beaten up by him with a pistol prior to that time; that E. M. Page was out in the yard, cursing and saying he was going to throw everything out in the yard, and using very profane language, and his wife and boy were crying and pleading; that he jumped out of bed, and that Page was coming toward the house; that he told him to stop, but he did not, and that Crawford shot Page to keep him from shooting him; that Page had on an overcoat buttoned up and a stick in his left hand, and a gun in his right hand; that when he shot him, Page turned and walked to the car; that he could have shot him twice, but only shot him once. The son and wife of Crawford did not testify.

We think the dying declaration was competent; that the proof was sufficient to show that deceased had abandoned all hope of recovery, and realized that death was impending.

The state's instruction No. 1 was as to the form of the verdict, if convicted of murder, and instruction No. 2 defined manslaughter and told the jury, if they believed

the defendant, Crawford, so killed the deceased, Page, that they would convict him of manslaughter. We think the two together followed by conviction of the defendant of manslaughter precludes appellant from saying that the instruction on the form of a verdict was error. The two will be treated as constituting a complete announcement of law, and we find no reversible error in the other instructions for the state.

It is urged that the court erred in not giving the instruction that a man may defend his house, as well as his person, and that the instruction limiting the defense to the defendant's own person omits the defense of his habitation. The appellant's own testimony showed that he shot the deceased to keep him from shooting him. There is no evidence of any felonious design upon the residence as such.

The appellant sought in his instructions to inject the element of the home defense; but appellant did not predicate his defense upon the theory that he shot deceased to prevent his entering his home, but stated that he shot him to prevent him from shooting him.

The defendant had ample instructions to present his defense, as made by the defense in the case, and there is no error in refusing the instructions which were refused.

There is no merit that the jury was permitted to be separated. The only facts shown are that one of the jurors, in company with one of the bailiffs in charge of the jury, started to the toilet, and got inside the door, not out of the sight of the bailiff, when the sheriff stopped them, and the juror was returned to the jury room, and the sheriff told the bailiff not to retire one juror alone, but to retire the whole jury. The proof clearly and conclusively shows that this juror did not see or converse with any one, and that the jury were not, in fact, separated.

The judgment will accordingly be affirmed.

*Affirmed.*