WADE v. STATE.*

(In Banc.   May 16, 1927.)

[112 So. 677.   No. 26327.]

1. HOMICIDE.   *Statement by deceased as to who shot him held admis-*
   *sible as dying declaration, though he asked for doctor shortly*
   *after making statement.*

   Statement of deceased relative as to who had shot him, wherein he
   expressed belief that he was going to die and asked those
   around to pray for him, *held* admissible as a dying declaration,
   notwithstanding that, after making statement, deceased
   had asked that a doctor be sent for, since such request is not
   alone sufficient to show that he had hopes of living at time he
   made statement.

2. HOMICIDE.   *Test of "dying declaration" is honest and reasonable*
   *belief of deceased of impending death at time of statement.*

Test of whether deceased's statement is admissible as "dying declaration" is honest and reasonable belief of deceased as to impending death at time he made statement.

3. HOMICIDE. *Evidence held to sustain conviction for murder.*

Evidence, in prosecution for murder, *held* sufficient to sustain conviction.

ANDERSON and ETHRIDGE, JJ., dissenting.

---

*Corpus Juris-Cyc. References: Homicide, 30CJ, p. 255, n. 24; p. 258, n. 51 New; p. 266, n. 44; p. 267, n. 65; p. 310, n. 25; On admissibility of dying declaration of person for whose death accused is on trial, see annotation in 56 L. R. A. 406; 30 L. R. A. (N. S.) 393; 1 R. C. L. 545; 1 R. C. L. Supp. 193; 4 R. C. L. Supp. 40; On admissibility of dying declarations made by person under sense of impending death, see annotation in 56 L. R. A. 382; 1 R. C. L. 537.

APPEAL from circuit court of Holmes county.

HON. S. F. DAVIS, Judge.

Will Wade was convicted of murder, and he appeals. Affirmed.

*Carl F. Drake,* for appellant.

Appointed by the court to defend this negro without recompense, I am resolved to do my part as best I can to give him the benefit of every legal right to which he is entitled. As a foundation for the admission of the alleged dying declaration of deceased the court seems to have relied mainly upon the statement of deceased that he was going to die. While the declarant's statements may be sufficient to show a sense of impending dissolution, this is not always true. The mere fact that declarant said that he would die does not necessarily show that he was without hope of recovery. His statements may be overcome by the surrounding circumstances. 30 C. J. 265; *Bell* v. *State,* 72 Miss. 507, 17 So. 232.

From the circumstances of this case, it appears to be a positive fact that deceased was mistaken as to Will Wade's taking part in the shooting. If deceased had not been laboring under a mistake he would in his dying

declaration have accused Fred Chambers instead of Will Wade. We submit that the record fails to show that the accused did anything to incite, encourage or assist the person or persons who fired the fatal shot; and, therefore, under the rule announced in *Crawford* v. *State,* 110 So. .517, and *Bruce* v. *State,* 103 So. 133, the judgment should not be allowed to stand.

*J. A. Lauderdale,* Assistant Attorney-General, for the state.

Counsel for appellant insists that the dying declaration of Jones made to Mackey was incompetent and inadmissible. The leading case on dying declarations in this state is *Lipscomb* v. *State,* 75 Miss. 559. The doctrine laid down in this case has been consistently followed by this court. The last utterance of the court on this question is found in *Crawford* v. *State,* 110 So. 517. In the Crawford case the court sets out the testimony with reference to the competency of a dying declaration in full. I submit that the testimony in this case is much stronger than that in the Crawford case.

We submit that the proof in this case is amply sufficient to show that Will Wade was a joint actor and an active participant in the shooting. Not only that, but it is sufficient to prove beyond a reasonable doubt that the shot fired by Will Wade was the one that produced the death of the deceased. *McCoy* v. *State,* 91 Miss. 257.

The judgment of the trial court should be affirmed.

Argued orally by *C. F. Drake,* for appellant, and *J. A. Lauderdale,* Assistant Attorney-General, for the state.

HOLDEN, P. J., delivered the opinion of the court.

Will Wade appeals from a conviction of the murder of H. L. Jones, city marshal of Pickens, and a sentence of death.

The facts and circumstances of the homicide are substantially as follows: About 11 o'clock on a Saturday night in July, 1926, H. L. Jones, the marshal of Pickens, was shot in the abdomen, from which wound he died on the following Tuesday. The shooting occurred on the main street of Pickens, at a point where Mr. Jones, the marshal, operated a pressing shop on the west side of the street, and a negro barber shop was located on the opposite side of the street. Mr. Jones was shot while near the middle of the street, between these two places, just after he had left his pressing shop and was approaching the automobiles of Lou Arthur Wade and the appellant, Will Wade.

Lou Arthur Wade and the appellant, Will Wade, were brothers. The latter had stopped his car in the street, and then he went into the barber shop, got his pistol, and placed it on the front seat of his car, which he attempted to crank. About this time Lou Arthur Wade and one Chambers drove south on this street, and stopped their car near the rear end of appellant's car, and Will Wade was trying to buy some whisky from his brother, and they disagreed about the measurement of the liquor. While thus quarreling, the deceased, H. L. Jones, came out of his pressing shop and walked across the street toward the end of the car occupied by Lou Arthur Wade, and some one in this car shot at Mr. Jones with a pistol, whereupon Jones reached into his right hip pocket, pulled his pistol out, and began firing; when this shooting started, two shots were fired from the front end of the car occupied by Will Wade, both shots being fired at or in the direction of Mr. Jones, who was close by. A total of twenty-five shots were fired. Lou Arthur Wade was killed. Jones was shot through the abdomen. The other negroes fled from the scene.

After Jones was shot, he walked to the pressing shop, left his pistol, and then walked about a block and a half to the home of H. S. Mackie, mayor of Pickens. Mayor Mackie heard some one call and opened the door, and just

as the door opened Jones fell on the front porch. He was afterwards taken into the house, where he lay mortally wounded, and, while in this condition, and within a few minutes after he had reached the home of the mayor, Jones made a dying statement as to who shot him, in which statement he said that the appellant, Will Wade, and Lou Arthur Wade had shot him.

Before the deceased made this statement, he said to Mr. Mackie:

"Hardie, I was doing my duty; they have killed me and I am going to die, and I am not ready to go.

"Q. What did you ask him? A. I said, 'Hubert, who killed you?' And he said, 'Lou Arthur Wade and Will Wade.' And I said, 'Wasn't there more shooting besides you three?' And he said, 'I don't know; I know I hit Lou Arthur Wade, but I don't know whether I killed him or not.'

"Q. And he said Lou Arthur Wade and Will Wade were both shooting at him? A. Yes, sir."

The witness Mackie further testified that the deceased asked those around him to pray for him, which he and Jones' wife did. On cross-examination, the question was asked Mackie, "Did he ask you to phone for a doctor? A. Yes, sir." It seems that the deceased asked that a doctor be phoned for shortly after he had made the statement as to who shot him; that the deceased, at the same time, also asked Mackie to phone for his wife, that he was suffering great pain and agony from the wound he had received in the abdomen. Jones was afterwards removed to a hospital, where he died.

The defendant offered no evidence at the trial, nor did he take the stand in his own behalf.

The appellant presents several grounds for reversal, but only one merits discussion by us; that is, whether or not the dying declaration was admissible.

It is contended that the statement of deceased was not admissible as a dying declaration, because he had asked that a doctor be phoned for shortly after he had

made the dying statement. It is urged that the declaration of deceased was incompetent because, when he asked Mackie to phone for a doctor, he evinced the hope that he was not.going to die at the time he made the statement; that this fact showed that the deceased had not abandoned all hope, and that therefore the statement was not made in view of impending dissolution, but that the statement was made at a time when the deceased had hopes of living, because he had asked for a doctor to attend him.

We think the statement of the deceased was admissible as a dying declaration. He had positively expressed the belief that he was going to die—that death was then impending in his thought. He had said, "Hardie, I was doing my duty; they have killed me and I am going to die and I am not ready to go." He had also asked that those around him pray for him. While in this state of mind he had said that Lou Arthur Wade and the appellant, Will Wade, shot him. As best we can discern from the record, deceased then asked Mackie to phone for a doctor and also for his wife.

The circuit judge after hearing the preliminary inquiry as to whether the dying statement was admissible, was of the opinion that it was a statement made in view of impending dissolution. While the decision of the trial judge on such a question is not conclusive on review, yet it is persuasive and should not be disturbed unless it be clear that the statement was not made in view of impending death. It should appear to the trial judge, beyond all reasonable doubt, that the statement was made in the solemn sense of impending death.

The fact that the deceased asked for a doctor after making the statement is not alone sufficient to show that he had hopes of living at the time he made the statement in this case. It would be natural for a man suffering from a mortal wound, and who believed he was dying, to ask for a doctor and his wife, as the deceased did here. The question is whether the deceased reasonably believed and realized, under the circumstances, that he

was going to die at the time he made the statement; and, if it appear, as it does here, that he believed he was hopelessly nearing death's door when he made the statement, it would be admissible, even though the deceased afterwards asked for a doctor or his condition improved to the extent that he had hopes of living. The test is, What was the honest and reasonable belief of the deceased as to impending death at the time he made the statement? Subsequent statements, not connected with the expressed belief in death, could not render the statement inadmissible in evidence if it was admissible before such subsequent statements were made. In the case at bar we are unable to say, because the record leaves it doubtful, whether the request of the deceased "to phone for a doctor" was close enough to the dying statement to be considered as connected therewith, but we say that, even though it was a part of the dying declaration, still it was not sufficient to render inadmissible the statement of the deceased, which is shown to have been made in view of impending death. 30 C. J., p. 267. Therefore we think the contention of appellant is untenable. *Lipscomb* v. *State,* 75 Miss. 559, 23 So. 210, 230; *Crawford* v. *State,* 144 Miss. 793, 110 So. 517.

We have carefully considered the point made as to the admissibility of the testimony of Sula Thomas with reference to the excited condition of Will Wade at the time of the shooting, and see no merit in this point.

We have also examined the proposition as to the refusal of the court to charge the jury that it was necessary to prove a conspiracy before a conviction could be had in the case, and we do not think the court erred in refusing this instruction.

It is also contended that the proof in the case is insufficient to sustain the verdict of the jury. We disagree with counsel for appellant on this point, because two eyewitnesses testified to the fact that the appellant shot at and in the direction of the deceased marshal while within a few feet of him, and the dying declaration of

Jones also shows that the appellant shot him; and we think the proof in the case was sufficient to warrant the jury in its verdict.

In view of the conclusions reached above, the judgment of the lower court is affirmed, and the date of execution is set for Friday, July 8, 1927.

*Affirmed.*

A<small>NDERSON</small>, J. (dissenting).

In my opinion, the alleged dying declaration was not admissible. The state undertook to prove the dying declaration alone by the witness Mackie. The direct and cross-examination of the witness Mackie, construed together, demonstrated, beyond question, it seems to me, that the statement of the deceased that the two Wade negroes had shot and killed him, and his request that a doctor be sent for to attend him, was all one connected conversation between the deceased and the witness Mackie. The pertinent part of the cross-examination follows:

"Q. Then what did you ask Jones, if anything? A. The first question I asked him?

"Q. Yes. A. I asked him who shot him.

"Q. What did he say to you? A. Lou Arthur Wade and Will Wade.

"Q. What else did he say? A. He asked me to phone his wife, and I think a young fellow named Will Owens came in my gate, and I asked him to get his wife.

"Q. Did he ask you to phone for the doctor? A. Yes, sir."

The alleged dying declaration was made some minutes after the shooting. Jones, the deceased, had gone into his pressing shop and left his pistol, and had walked about one and one-half blocks to the home of the witness Mackie.

A dying declaring is unsworn, hearsay testimony. Being without the sanctity of the usual oath, the law re-

quires that the declarant must believe that the finger of death is upon him; that there is no hope of recovery, however small, and this must be proven to the trial court to a moral certainty, and beyond every reasonable doubt, before the alleged dying declaration is admissible before a jury. *McNeal* v. *State*, 115 Miss. 678, 76 So. 625. Our court, in several decisions, has laid down the following principles governing the admissibility of alleged dying declarations: There must be an undoubted belief existing in the mind of the declarant, at the time of the alleged dying declaration, that death is impending; that there is no hope whatever of recovery. If it appear, in any manner, that there was hope of recovery, however faint, it may have been still lingering in the breast of the declarant, then the sanctity is gone, and the declaration is not admissible. *Bell* v. *State*, 72 Miss. 507, 17 So. 232; *Sparks* v. *State*, 113 Miss. 266, 74 So. 123; *McNeal* v. *State*, *supra*; *Haney* v. *State*, 129 Miss. 486, 92 So. 627; *Lea* v. *State*, 138 Miss. 761, 103 So. 368; *Fannie* v. *State*, 101 Miss. 378, 58 So. 2.

In the Bell case, the court held that, in order to render a dying declaration admissible in evidence, there must have existed in the mind of the declarant a settled belief of impending death, and that the mere fact that the declarant stated such belief was not conclusive of its existence. In the McNeal case, the alleged dying declaration was to this effect: Deceased stated that defendant came and persuaded him off, and shot him without cause, and that "now they had got him." And the witness testified that, during conscious intervals, the deceased prayed the Lord to help him, and said the Lord had helped him once before when he had prayed to Him; that about an hour after this statement was made the deceased told the witness that he (deceased) was going to die. The court held that the alleged dying declaration was inadmissible.

In the Haney case, the alleged dying declaration was made only a minute or two after the shooting in the ab-

sence of defendant. The alleged dying declaration was to the effect, that the accused shot the declarant, and shot him for nothing, and made a request that some one "pray for me." The court held that such alleged dying declaration failed to meet the requirements of law; that the request by declarant that some one pray for him was indication of a hope of recovery.

In the Lea case, the deceased lingered about thirty days, and then died from a wound inflicted by defendant. During that period the deceased several times stated that he had no hope of recovery, but, immediately before making the alleged dying declaration, he was asked how he felt, and replied that he felt very well. He was then told by his nurse that there was no hope of his recovery; that he would probably die during the day, to which he replied, "I reckon so." His nurse then stated to him in that connection that a declaration from him as to the facts of the homicide might be appreciated by his loved ones, in reply to which he said that he would make the statement later. Immediately thereafter he made a statement as to the facts of the homicide, which was taken down by his nurse without his knowledge. The court held that such alleged dying declaration was incompetent; that the evidence failed to show that the declarant was without any hope whatever of recovery.

In the Fannie case, the alleged dying declaration was in this language: " 'Come carry me back to the doctor, I am shot to death.' And, while they were looking for the doctor, said: 'I am going to die. Make haste and get the doctor. I am bleeding to death. I am going to die. Don.'t bother me and get the doctor.' And again: 'Make haste, Mamma, and get the doctor, I am going to die.' "

The court held that the dying declaration was inadmissible.

It is stated in 30 C. J., section 504, pp. 265, 256, that the mere fact that the declarant said he would die does not necessarily show that he is without hope, or that he

expects a speedy dissolution, and that such statement may be overcome by the surrounding circumstances.

When the witness Mackie was told by Jones, the deceased, that the Wade negroes had shot and killed him, the deceased, doubtless, intended to convey the idea that he thought he was going to die. But merely *thinking* he was going to die was not sufficient. He must have thought it so strongly as to exclude every hope of recovery, however faint. His asking the witness, Mackie, to send for the doctor, to say the least, I think, raises a reasonable doubt as to whether the deceased was without hope. If he was without hope, why did he want a doctor?

ETHRIDGE, J., joins in this dissent.